Peggy E. LOONAN, Jandel Theresa Allen–Davis, Michael D. Rudnick, and James A. McGregor, Plaintiffs–Appellees,

v.

William WOODLEY and Patricia Miller, Defendants–Appellants,

and

Natalie Meyer, in her official capacity as Secretary of State for the State of Colorado, Defendant.

No. 94SA310.

Supreme Court of Colorado, En Banc.

Oct. 24, 1994.

Justice MULLARKEY delivered the Opinion of the Court.

Appellees Loonan, Allen–Davis, Rudnick and McGregor brought this action to challenge the sufficiency of initiative petitions circulated by appellants Woodley and Miller [1] that would require parental notification of an unemancipated minor's decision to have an abortion. Appellees' sole contention is that the appellants collected an insufficient number of valid signatures to include the initiative on the November 1994 ballot because the circulators' affidavits did not include the statement that the circulator "has read and understands the laws governing the circulation of petitions" as required by section 1–40–111(2), 1B C.R.S. (1994 Supp.).

The trial court agreed and entered an order (1) vacating the Secretary of State's determination of the sufficiency of the petition and (2) enjoining the Secretary from certifying the proposed initiative to the county clerks of Colorado for inclusion on the November 1994 ballot. Appellants appealed directly to this court under section 1–40–119, 1B C.R.S. (1994 Supp.), and we accepted the appeal. Appellants contend that they substantially complied with the statutory requirements and, alternatively, that the requirements in question are unconstitutional.

For the reasons stated below, we affirm the trial court's ruling.

## I.

Article 40, sections 1–40–101 to –133, 1B C.R.S. (1994 Supp.), establishes the statutory requirements for exercising the powers of initiative and referendum reserved to the people by Article V of the Colorado Constitution. Colo. Const. art. V, § 1. The statute prescribes the form of "initiative petitions for state legislation and amendments to the constitution" as required by section 1(2) of Article V and the requirements for "submi[ssion of] all measures initiated by or referred to the people for adoption or rejection at the polls" under section 1(6). *Id.* §§ 1(2), (6). At issue in this case are those provisions

Rumler Davies, P.C., Joseph A. Davies, Cyndi L. Lyden, Denver, for defendants/appellants.

Isaacson, Rosenbaum, Woods & Levy, P.C., Mark G. Grueskin, Juli E. Lapin, Denver, for plaintiffs/appellees.

Gale A. Norton, Atty. Gen., Stephen K. Erkenbrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., for Natalie Meyer, Colorado Secretary of State.

1. Pursuant to § 1–40–104, 1B C.R.S. (1994 Supp.), appellants Woodley and Miller are the designated representatives of the subject petition.

which govern the contents of the circulators' affidavits and the validation of a petition by the Secretary of State.

Section 1–40–111(2) requires that

To each petition section shall be attached a signed, notarized, and dated affidavit executed by the registered elector who circulated the petition section, which shall include ... [a statement] that *he or she has read and understands the laws governing the circulation of petitions*....

§ 1–40–111(2), 1B C.R.S. (1994 Supp.) (emphasis added). The underscored language was an amendment added by Senate Bill 93–135. *See* Ch. 183, sec. 1, § 1–40–111(2), 1993 Colo.Sess.Laws 676, 683–84. It became law on May 4, 1993, and applies to actions taken after that date. *Id.* at 699. Section 113(1) provides that "[a]ny petition section which *fails to conform to the requirements of this article* or is circulated in a manner other than that permitted in this article *shall be invalid.*" § 1–40–113(1), 1B C.R.S. (1994 Supp.) (emphasis added). This language predated the 1993 amendments and was reenacted and recodified by Senate Bill 93–135 without significant change. Ch. 183, sec. 1, § 1–40–113(1), 1993 Colo.Sess.Laws 676, 684.

Appellants Woodley and Miller sponsored a petition to amend the Colorado Constitution pursuant to these statutory and constitutional provisions. The petition was entitled "Parental Involvement" and would require parental notification when an unemancipated minor under eighteen years of age decided to have an abortion. Prior to circulating the petition, Woodley and Miller received copies of the Secretary of State's Initiative Manual. The manual incorporated a sample circulator's affidavit with all language required under the amended section 111(2), and which reprinted the text of section 111(2). The petitions that Woodley and Miller actually circulated, however, used circulators' affidavits based upon a form used in previous petition campaigns rather than the affidavit

form included in the manual.[2] None of these affidavits included a statement that the circulator "read and understands the laws governing the circulation of petitions" as required by section 111(2).

Despite the missing language on the circulators' affidavits, the Secretary of State issued a Sufficiency Determination which indicated that the petitions fulfilled the statutory requirements and directed that the proposed amendment would appear on the November 8, 1994, ballot.

## II.

We will begin by addressing the sufficiency of the petitions under sections 111(2). Woodley and Miller assert that compliance with election regulations must be judged on a "substantial compliance" standard rather than according to the strict compliance standard imposed by the trial court. The circulators' affidavits attached to each "Parental Involvement" petition substantially complied with the requirements of section 111(2), appellants argue, and thus the signatures were valid under the statute. While we agree that conformity with the statutory requirements for initiatives and referenda must be determined on the basis of substantial compliance, we do not agree that Woodley and Miller achieved substantial compliance in this instance.

The right of initiative and referendum, like the right to vote, is a fundamental right under the Colorado Constitution. *See Clark v. City of Aurora,* 782 P.2d 771, 777 (Colo.1989) (right of initiative); *Meyer v. Lamm,* 846 P.2d 862 (Colo.1993) (right to vote).[3] Likewise both the right to vote and right of initiative have in common the guarantee of participation in the political process. *See McKee v. City of Louisville,* 616 P.2d 969, 972 (Colo.1980) ("Like the right to vote, the power of initiative is a fundamental right at the very core of our republican form of

---

2. In spite of the missing language, these forms were approved by Secretary of State Natalie Meyer prior to circulation. However, Woodley and Miller have not asserted any form of estoppel theory.

3. The right to initiative and referendum is not a federal constitutional right, but is guaranteed by the state under Article V, section 1 of the Colorado Constitution. *See Committee for Better Health Care v. Meyer,* 830 P.2d 884, 890 n. 7 (Colo. 1992).

government.") In light of the nature and seriousness of these rights, we have held that constitutional and statutory provisions governing the initiative process should be "liberally construed" so that "the constitutional right reserved to the people 'may be facilitated and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right.'" *Montero v. Meyer,* 795 P.2d 242, 245 (Colo.1990) (citations omitted). Similarly, we have found that "the exercise of the voting right [should not] be conditioned upon compliance with a degree of precision that in many cases may be a source of more confusion than enlightenment to interested voters." *Lamm,* 846 P.2d at 875 (citing *Erickson v. Blair,* 670 P.2d 749, 754 (Colo.1983)).

In the voting rights context we have held that the rule of "substantial compliance" provides the appropriate level of statutory compliance to "facilitate and secure, rather than subvert or impede, the right to vote." *Lamm,* 846 P.2d at 875 (citation omitted). While we have never explicitly held that the rule of substantial compliance is the appropriate standard for gauging adherence to statutes regulating the right of initiative and referendum, we have upheld petitions which "disclose[d] a substantial compliance with the statutory provisions." *Brownlow v. Wunsch,* 103 Colo. 120, 132, 83 P.2d 775, 781 (1938). Given the similar nature of the right to vote and the right of initiative and referendum, and the common statutory goal of inhibiting fraud and mistake in the process of exercising these rights, we now hold that substantial compliance is the appropriate standard to apply in the context of the right to initiative and referendum.

This court recently addressed the issue of substantial compliance under the election regulations of Article X, section 20 of the Colorado Constitution, commonly known as "Amendment 1," in *Bickel v. City of Boulder,* No. 94SA130, 1994 WL 493708 (September 12, 1994). In *Bickel* we held that

> [i]n determining whether a district has substantially complied with a particular provision of Amendment 1, courts should

consider factors including, but not limited to, the following: (1) the extent of the district's non-compliance in the particular ballot issue before the court, that is, a court should distinguish between isolated examples of district oversight and what is more properly viewed as systematic disregard for Amendment 1 requirements, (2) the purpose of the provision violated and whether that purpose is substantially achieved despite the district's noncompliance, and (3) whether it can reasonably be inferred that the district made a good faith effort to comply or whether the district's noncompliance is more properly viewed as the product of an intent to mislead the electorate.

*Id.* at 17–18. Taking these factors into consideration, and finding the second factor dispositive, we struck down a portion of a ballot issue that would have allowed the City of Boulder to increase ad valorem property taxes in the event that sales and use taxes were insufficient to pay the principal and interest on proposed bonds. We struck down the proposed tax increase because the ballot title failed to provide a dollar estimate of the proposed increase despite the City's compliance with the ballot requirements in all other respects, and despite the unlikelihood that it would ever be necessary to increase the tax. We reasoned that since Amendment 1 not only expressly requires a dollar estimate for a proposed tax increase, but also requires that the information be provided in a specific format, failure to include that information did not constitute substantial compliance. *Id.* at 41. Moreover, because voters would not have that information at the polls, the Amendment 1 goal of promoting informed choice was not substantially achieved with respect to that portion of the ballot issue. *Id.*

This case is analogous. Like *Bickel,* the second factor is dispositive in this case because the 1993 statutory amendment is so clear, direct and specific, and because the appellants made no attempt to comply with it.

The purpose of the statute is to "properly safeguard, protect, and preserve inviolate" for the people the powers of initiative and

referendum. § 1–40–101. To this end, the statute prescribes very particular requirements as to form, procedure, and disclosures that must be followed by the proponents of a petition. *See, e.g.,* § 1–40–110 (prescribing the text of a warning to be printed verbatim at the top of each page of every initiative or referendum petition section); § 1–40–111 (requiring *inter alia* that the circulators' affidavits include a statement that "each signature thereon was affixed in the circulator's presence; that each signature thereon is the signature of the person whose name it purports to be; that to the best of the circulator's knowledge and belief each of the persons signing the petition was, at the time of signing, a registered elector; and that he or she has not paid or will not in the future pay and that he or she believes that no other persons has so paid or will pay, directly or indirectly, any money or other thing of value to any signer for the purpose of inducing or causing such signer to affix his or her signature to the petition"); § 1–40–112 (requiring circulators to wear a badge with their name and "VOLUNTEER CIRCULATOR," if they are not paid for circulating the petition, and "PAID CIRCULATOR," if they are, in bold-face type).

Woodley and Miller argue that the affidavit they used documented compliance with all of the statutory requirements for gathering signatures under other sections of the statute, and thus it was superfluous to require the circulators also to document that they had read those statutory provisions. We reject this argument. Appellants made no attempt to demonstrate that, in fact, all circulators read and understood the current election laws but mistakenly signed outdated affidavits. Rather, in essence, they assert only that the pre–1993 affidavit substantially complies with the affidavit required by the 1993 statutory amendments.

■ First, even a cursory review of the election laws demonstrates that there are other statutory requirements that are not individually enumerated in section 111(2) and thus do not appear on the face of the required affidavit. For example, each circulator must wear a badge with the circulator's name and the words "VOLUNTEER CIR-CULATOR" or "PAID CIRCULATOR" written in bold type on the badge, section 1–40–112(2); circulators may not assist a disabled or illiterate person to complete the required information on the petition, section 1–40–111(1); and they may not circulate a petition purporting to be endorsed by an organization if they know that the organization has not provided written consent to do so. § 1–40–130(1)(a). The affidavit does not explicitly document compliance with any of these statutory provisions. The purpose of the affidavit is the assurance the circulators were aware of their important role in implementing all of the statutory safeguards and in assuring the validity of the signatures they collect. *Committee for Better Health Care v. Meyer,* 830 P.2d 884, 894 (Colo.1992) ("A requirement of third-party authentication of circulator signatures is justified as a measure to protect the integrity of the initiative process insofar as it emphasizes the significance of the personal responsibility circulators must assume to prevent irregularities in the initiative process.") Without becoming familiar with the statute, the circulator cannot be aware of these requirements.

■ Second, the affidavit serves as the prima facie evidence that the signatures therein are "genuine and true" as required by the constitution. Colo. Const. art. V, § 1(6). Without a statement indicating that the circulators read and understand the law, there is no basis in the affidavit on which to assume that the circulators know what makes a signature "genuine and true" nor that they enforced the safeguards imposed by statute to guarantee that a signature is "genuine and true." After all, as we have stated before, "[t]he central feature of an affidavit is its assurance, pursuant to oath, that the contents of a subscribed document are, to the subscriber's personal knowledge or belief, true." *Otani v. District Court,* 662 P.2d 1088, 1090 (Colo.1983). As a consequence, the omission of this pledge of personal knowledge and understanding indicates that the affidavit has failed to achieve its purpose.

■ Finally, we note that determining what information must be included on the affidavit form does not require any interpretation of statutory requirements or any exer-

cise of discretion by the petition sponsors. Petition sponsors, such as Woodley and Miller, are provided with sample affidavits by the Secretary of State that comply fully with the statutory requirements. Accordingly, failure to include the statement that each circulator "has read and understands the laws governing the circulation of petitions" indicates that the appellants disregarded or were unaware of the 1993 legislative amendments. The omission of the required affidavit language conclusively demonstrates that the circulators of the petition did not read those laws much less understand them. Following *Bickel*, then, we find that the affidavits do not "substantially comply" with the statutory requirements of sections 111(2) and 113(1).

### III.

Woodley and Miller also contend that the "read and understand" requirement is unconstitutional. They assert that these statutory provisions are subject to strict scrutiny because they regulate the exercise of fundamental rights. Applying this level of scrutiny, they argue, the provisions are unconstitutional because they are not "narrowly crafted" to achieve a compelling state interest. In addition, Woodley and Miller assert that the "read and understand" requirement of section 111(2) is unconstitutionally vague. We do not agree.

### A.

 We have consistently recognized that the power of initiative and referendum reserved for the people under Article V of the Colorado Constitution, like the right to vote, is a fundamental right. *Committee for Better Health Care*, 830 P.2d at 890 n. 7; *Clark*, 782 P.2d at 777; *Urevich v. Woodard*, 667 P.2d 760, 762 (Colo.1983); *McKee*, 616 P.2d at 972. Not every law that affects the initiative process need be subject to strict scrutiny, however.

In considering the validity of statutory provisions affecting the power of initiative, this court has addressed three types of regulatory situations. In the first situation, we have recognized that, because the initiative power is self-executing by the terms of Article V, " '[o]nly such legislation is permissible as is in furtherance of the purpose, or as will facilitate the enforcement, of such provision, and legislation which will impair, limit or destroy rights granted by the provision is not permissible.' " *E.g., Yenter v. Baker*, 126 Colo. 232, 237, 248 P.2d 311, 314 (1952) (citation omitted). Where a statutory provision has addressed the same subject matter as the constitutional provision, we have struck down any statutory provision which tends to narrow the constitutional right. *See id.* (striking down a provision requiring initiative petitions to be filed "at least eight months" prior to election where the constitution provided that they be filed at least *four* months in advance); *Colorado Project–Common Cause v. Anderson*, 178 Colo. 1, 495 P.2d 220, 221 (1972) (striking down as "a limitation not authorized by the constitution" a statutory requirement that signing and circulation of petitions must be by *registered electors* rather than *qualified electors* as specified in the constitution).[4] This rule recognizes the supremacy of a constitutional provision and that the purpose behind a constitutional enactment is to "put it beyond the power of the legislature to render it nugatory by passing restrictive laws." *Yenter*, 126 Colo. at 237, 248 P.2d at 314.

In the second situation, where a statute regulates situations not addressed in the constitutional text, this court has evaluated whether the statute "enhances rather than restricts" the right of the people to initiative. *In re Interrogatories Propounded by Senate Concerning House Bill 1078*, 189 Colo. 1, 8, 536 P.2d 308, 314 (1975) [hereinafter *In re House Bill 1078*]. In this situation we have held that "the legislature may, so long as it does not diminish these rights, enact provisions regarding their exercise." *Id.*[5]

---

4. The Colorado Constitution was subsequently amended in 1980 to require the signing and circulation of petitions by "registered" electors. *See* Senate Concurrent Resolution No. 7, 1979 Colo.Sess.Laws 1672, 1674.

5. In *In re House Bill 1078*, we upheld a provision that gives effect to the constitutional amendment which received the greatest number of affirmative votes in cases when two constitutional amendments adopted by initiative are in direct

Our cases also have addressed a third situation where the general assembly enacts laws governing the form and procedures for exercising the initiative power where those forms and procedures are not prescribed in the constitution. In these circumstances, the power to enact laws governing the form of petitions is expressly delegated to the general assembly by Article V. Colo. Const. art. V, § 1(2) ("Initiative petitions for state legislation and amendments to the constitution, *in such form as may be prescribed pursuant to law*, shall be addressed to and filed with the secretary of state...."). Beyond these specifically authorized provisions, we have found that related procedural legislation, "designed to prevent fraud, mistake or other abuses in the initiative process is [also] firmly rooted in the constitutional soil." *Committee For Better Health Care*, 830 P.2d at 893.

Most of these laws, by their nature, tend to restrict the initiative process insofar as any formal requirements increase the potential for omission of required information or scrivener error, or otherwise serve to channel initiative activity. *Id.*, at 895; *see also Burdick v. Takushi*, —— U.S. ——, —— – ——, 112 S.Ct. 2059, 2062–63, 119 L.Ed.2d 245 (1992) ("Election laws will invariably impose some burden upon individual voters," yet, "[c]ommon sense ... compels the conclusion that government must play an active role."). Recognizing the legitimacy of such legislation and its desirability, this court has applied a bifurcated standard of review. We have acknowledged that, despite the fundamental nature of this right, we "must accord some deference to the judgment of [the legislative body] in fashioning procedures calculated to prevent mistake, fraud and other abuses and thus assure that the true will of the people will be manifested in the initiative and referendum." *Clark*, 782 P.2d at 778. We have evaluated legislation that imposes a formal requirement on the initiative process on the basis of whether it is "reasonably necessary" to ensure the integrity of the initiative. *See id.* (upholding requirements that a registered elector who signs a referendum petition print after the signature his or her name, provide

other information pertaining to residence, and designate the date of signing the petition); *Committee for Better Health Care*, 830 P.2d at 895 (upholding informational requirements for signatories and circulators).

In circumstances where a regulation actually limits or hinders the ability of the people to initiate legislation, we have applied strict scrutiny to that provision. For example, in *Urevich*, 667 P.2d 760, this court struck down a statute that prohibited direct or indirect payment "in consideration of or as an inducement to" circulation of a petition. The court took judicial notice of the fact that it is often more difficult to persuade people to work without compensation than it is to obtain workers for pay, *id.* at 763, and found that, without pay, few have the "ardor and stamina to engage in it without remuneration." *Id.* We then applied strict scrutiny and struck down the prohibition as it "unnecessarily trammell[ed] the fundamental right of initiative." *Id.*

Similarly, in *McKee*, 616 P.2d 969, we applied strict scrutiny and held that the incorporation of an emergency clause in a city ordinance could not exempt it from submission to the electorate upon a petition for initiative. We stated, "where as here the power of referendum is ostensibly unavailable to the people through the constitutional exemption of an emergency clause, nothing short of jealous judicial protection of the one remaining power of the electorate is in order." *Id.* at 972.

Most recently, in *Committee for Better Health Care*, 830 P.2d 884, we had the opportunity to apply both standards. We upheld a regulation requiring detailed residential information as reasonably necessary to prevent fraud, but invalidated a sample circulator's affidavit that required notarization by a notary public. We found that the informational requirements were "formal," *id.* at 895, but that requiring notarization by a notary public would "restrict the ability of circulators to obtain official authentication of their signatures, and thus to some extent would impede

---

and material conflict. We determined that the statute "enhance[d] rather than restrict[ed]" the power of the people to initiate legislation because

the statute provided "expression of the predominant will of the people." 536 P.2d at 314.

the initiative process." *Id.* at 894. We closely examined the purpose of the circulators' affidavits and determined that we could "discern no heightened protection to the integrity of the initiative process by a legislative determination permitting authentication of circulator signatures only by registered notaries public." *Id.* Interpreting the statute in order to avoid constitutional infirmities, we found that anyone authorized to administer oaths fulfilled the purpose of preventing mistake, fraud and abuse, and thus satisfied the statutory requirement that an affidavit be "notarized." *Id.*

Insofar as section 111(2) governs the form of the circulator's affidavit, it falls into this third category of regulation. We will apply the bifurcated standard elaborated in this third category of cases in considering Woodley and Miller's contention that the "read and understand" requirement under sections 111(2) and 113(1) impermissibly infringes on their fundamental right of initiative.[6]

### B.

■■■■ Because the statute requires a petition circulator to attest to reading and under-

standing the law governing circulation of petitions, it may limit the exercise of the power of initiative to the extent that the failure of a circulator to do so could potentially invalidate the signatures he or she collects.[7] Under the analysis above, this burden falls into the category of "formal" requirements to which this court has not applied strict scrutiny because, although the requirements limit the power of initiative, the limitation is not substantive. *See* discussion *supra* at II.A. Accordingly, we will address only whether this requirement serves to "enhance the integrity of the election process." We hold that it does.

■■■■ As we have previously recognized, circulators of petitions assume personal responsibility to prevent irregularities in the initiative process. *Committee for Better Health Care*, 830 P.2d at 894. The legislative intent behind the circulators' affidavits is to "ensure that circulators, who possess various degrees of interest in a particular initiative, exercise special care to prevent mistake, fraud, or abuse in the process of obtaining

---

6. In the context of voting rights, the United States Supreme Court has formulated a two-step, two-tier test that reflects the need for a more flexible standard than a blanket application of *strict scrutiny to state election regulations.* We note that this test parallels the bifurcated standard applied in our cases reviewing statutes regulating the initiative and referendum process.

The Supreme Court enunciated this test as follows:

A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of vot-

ers, "the State's important regulatory interests are generally sufficient to justify" the restrictions.
*Burdick v. Takushi,* —— U.S. ——, —— - ——, 112 S.Ct. 2059, 2063–64, 119 L.Ed.2d 245 (1992) (citations omitted).

7. Appellants Woodley and Miller also argue that the "read and understand" requirement impermissibly diminishes the pool of individuals who are capable of circulating petitions. If this assertion were true, the "read and understand" requirement would be very similar to the requirement we struck down in *Urevich*, 667 P.2d 760. We do not believe this to be the case, however. The constitution itself requires circulators to verify that each signature on the petition is "the signature of the person whose name it purports to be" and that "each of the persons signing said petition was, as the time of signing, a registered elector." Colo. Const. art. V, § 1(6). Without the ability to read, a circulator cannot ascertain who signed a petition. Further, the ability to read and to determine the validity of the signatures on the petition implies the ability to read and understand instructions such as those delineating the duties of a circulator in this statute. Therefore, we conclude that the "read and understand" requirement does not diminish the pool of potential circulators from that available if the constitutional requirement were standing alone.

thousands of signatures of only registered electors throughout the state." *Id.* The affidavit also serves as the prima facie evidence that signatures therein are "genuine and true." Colo. Const. art. V, § 1(6). The statute governing the circulation of petitions prescribes very particular requirements as to form, procedure, and disclosures that must be followed by the proponents of a petition.[8] It would be impossible for a circulator to assure that these safeguards were respected without being aware of their existence and having a basic understanding of what they require the circulator to do. The "read and understand" statement makes certain that circulators have first-hand knowledge of these requirements and thus is a reasonable means of assuring that the circulator is familiar with the procedural safeguards that are his or her responsibility to implement. Accordingly, we find that the "read and understand" requirement of section 111(2) does not unconstitutionally infringe on appellants' constitutional right to petition.

### C.

Appellants Woodley and Miller also contend that the "read and understand" requirement of section 111(2) is unconstitutionally vague. "It is well settled that '[w]hen reviewing a statute upon a challenge of unconstitutionality due to vagueness, the duty of the reviewing court is to construe the statute so as to uphold its constitutionality whenever a reasonable and practical construction may be applied to the statute.'" *People v. Buckallew,* 848 P.2d 904, 907 (Colo.1993) (quoting *People v. Beruman,* 638 P.2d 789, 792 (Colo. 1982)). We find that a reasonable and practical construction is possible in this case, and accordingly, that the "read and understand" requirement is not unconstitutionally vague.

Section 111(2) specifically requires that the circulators' affidavits contain a statement that the circulator "has read and understands the laws governing the circulation of petitions." § 1–40–111(2). Appellants Woodley and Miller do not question the clarity of the requirement that this statement appear on the petition. Instead, they argue that lay circulators have no way of determining whether their "understanding" is legally sufficient, nor what "laws" they are to read and understand, for purposes of swearing that this statement is true.

 Under the United States and Colorado Constitutions, a statute violates due process protections when it "forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess as to its meaning and differ as to its application." *Watso v. Department of Social Servs.,* 841 P.2d 299 (Colo.1992). Statutes must "contain language that provides fair notice of what conduct is prohibited and provides enforcement authorities with sufficiently definite standards to ensure uniform, non-discriminatory enforcement of those prohibitions." *Id.*

In this instance, the provisions of the statute prescribing the duties of petition circulators are procedural in nature. They do not involve abstract determinations, interpretation, application of standards, or exercise of judgment that might require the skills of a professional. They merely enumerate what actions a circulator must and must not take while circulating a petition.[9] Thus, a circula-

---

8. *See, e.g.,* § 1–40–110 (prescribing the text of a warning to be printed verbatim at the top of each page of every initiative or referendum petition section); § 1–40–111 (requiring *inter alia* that the circulators affidavit include a statement that "each signature thereon was affixed in the circulator's presence; that each signature therein is the signature of the person whose name it purports to be; that to the best of the circulator's knowledge and belief each of the persons signing the petition was, at the time of signing, a registered elector; and that he or she has not paid or will not in the future pay and that he or she believes that no other person has so paid or will pay, directly or indirectly, any money or other thing of value to any signer for the purpose of

inducing or causing such signer to affix his or her signature to the petition"); § 1–40–112 (requiring circulators to wear a badge with their name and "VOLUNTEER CIRCULATOR," if they are not paid for circulating the petition, and "PAID CIRCULATOR," if they are, in bold-face type).

9. For example, circulators must wear a badge with the circulator's name and the words "VOLUNTEER CIRCULATOR" or "PAID CIRCULATOR" written in bold type on the badge, § 1–40–112(2); they may not assist a disabled or illiterate person to complete the required information on the petition, § 1–40–111(1); and they may not circulate a petition purporting to be endorsed by

**1390**

tor who has read these rules should have little trouble determining whether he or she "understands" them.

 Furthermore, the statute explicitly endorses the lay circulator's own interpretation of "understanding." Under the statute, a circulator may be penalized only for signing the affidavit without "reasonably believing that the statements made in the affidavit are true." § 1–40–130(1)(d). Understanding these rules thus requires nothing more than that a circulator *believe* that he or she knows what a circulator can and cannot do. This prohibition would ensnare only those circulators who made no attempt to understand their duties, or did not themselves believe they understood their duties. The "read and understand" language mandated in the circulator's affidavit accordingly provides fair notice of the prohibition because it accommodates the subjective belief of the circulator. We conclude, therefore, that this requirement is not impermissibly vague.

■ For much the same reason, we do not find that the designation "laws governing the circulation of petitions" is impermissibly vague. The election laws are codified and available to the general public. Circulators do not operate in a vacuum. Typically, and in this case, the Secretary of State distributes manuals which provide the procedural requirements for the initiative process, including the rules for circulating petitions. Moreover, as discussed above, circulators may not be penalized for failing to read all applicable laws as long as they "reasonably believe" that they have done so. § 1–40–130(1)(d).

### IV.

In conclusion, we affirm the trial court's order (1) vacating the Secretary of State's determination of the sufficiency of the petition and (2) enjoining the Secretary from certifying the proposed initiative to the county clerks of Colorado for inclusion on the November 1994 ballot. We reject the trial court's holding to the extent that it found

an organization if they know that the organization has not provided written consent to do so.

that statutory regulations governing initiatives and referenda require strict compliance. Instead, we hold that substantial compliance is the appropriate standard, but find that Woodley and Miller did not achieve substantial compliance in this instance. We also hold that the "read and understand" requirement under section 1–40–111(2) is constitutional.